# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs May 5, 2009

## STATE OF TENNESSEE v. LIA BONDS

**Direct Appeal from the Criminal Court for Shelby County**
**No. 05-00926     W. Mark Ward, Judge**

---

**No. W2008-02066-CCA-R3-CD  - Filed February 10, 2010**

---

Following a jury trial, Defendant, Lia Bonds, was convicted of second degree murder, and the trial court sentenced her as a Range I, standard offender, to twenty years. Defendant's conviction was affirmed on appeal. *State v. Lia Bonds*, No. W2006-01943-CCA-R3-CD, 2007 WL 3254711 (Tenn. Crim. App., at Jackson, Nov. 2, 2007). This Court, however, vacated Defendant's sentence because she was improperly sentenced under the 2005 amendments to the 1989 Sentencing Act. On remand, Defendant waived her ex post facto rights to be sentenced under the 1989 Sentencing Act, and the trial court sentenced Defendant under the 2005 amendments to twenty years. On appeal, Defendant argues that the trial court erred in determining the length of her sentence. After a thorough review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the Court, in which J. C. MCLIN and CAMILLE R. MCMULLEN, JJ., joined.

Claiborne H. Ferguson, Memphis, Tennessee, for the appellant, Lia Bonds.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Assistant Attorney General; William L. Gibbons, District Attorney General; and Chris Scruggs, Assistant District Attorney General, for the appellee, the State of Tennessee.

## OPINION

### I. Background

The facts supporting Defendant's conviction of second degree murder were previously set forth by this Court on appeal as follows:

In October of 2004, the victim, Ashley Webster, was nineteen years old and lived with her boyfriend, Rico Allen in an apartment at 1852 Keltner Street in Memphis. Before Mr. Allen started dating the victim, he was in a romantic relationship with [Defendant]. The relationship between [Defendant] and Mr. Allen continued while Mr. Allen was living with and dating the victim. At some point, the victim became aware of the continuing nature of the relationship between [Defendant] and Mr. Allen. The two women started "communicating" with each other in a hostile manner, including making threatening phone calls to each other. [Defendant] had even gone so far as to accuse Mr. Allen of burglarizing her home, and Mr. Allen was arrested based on [Defendant]'s claims to police. The accusations eventually resulted in dismissed charges. While Mr. Allen was in jail on the charges, [Defendant] left a copy of Mr. Allen's "rap sheet" on the victim's car windshield with the words, "stupid bitch you [sic] next" written on it.

On the morning of October 28, 2004, Mr. Allen woke up and left the apartment while the victim was still sleeping. After leaving the apartment, Mr. Allen went to hang out at a friend's house. [Defendant]'s car pulled up outside the friend's house. When [Defendant] parked, she noticed that Mr. Allen had the victim's car. At that time, [Defendant] and Mr. Allen were involved in a paternity dispute regarding [Defendant]'s son. Despite the dispute, [Defendant] wanted to find out if Mr. Allen planned on going to the hospital to see her son, who was having surgery that day. When Mr. Allen informed [Defendant] that he would not be going to the hospital, [Defendant] left. According to [Defendant], Mr. Allen had previously told her that he would come to the hospital. [Defendant] was "mad" and felt "intimated ... as well as jealous" when she discovered that Mr. Allen was driving the victim's car. According to [Defendant], Mr. Allen told her that "the relationship between him and her [the victim] was over and ... that they no longer communicated."

Sometime later that day, [Defendant] went over to the victim's house to "let her know that [she] had just been with her man." [Defendant] knocked on the door, and the victim asked who was at the door. When [Defendant] did not respond, the victim opened the door. [Defendant] told the victim "your nigga' going to get your windows busted out your car." According to [Defendant], who testified at trial, the victim tried to push [Defendant] out of the house.

-2-

[Defendant] would not leave so the victim hit [Defendant] with something she was holding in her hand, possibly a cell phone. The women "began to fight," then the victim went to the kitchen. [Defendant] was still standing in the living room at the time. The living room was closer to the front door than the kitchen. [Defendant] could have retreated through the front door, but was afraid that the victim would have "proceeded behind" her out of the front door. Once in the kitchen, the victim reached for a pair of scissors that were located in the butcher block knife holder on the kitchen counter. The entire knife block fell to the floor, scattering knives everywhere. The victim began to stab and cut [Defendant] with the scissors, first on the arms and then on her head.

At some point during the fight, the victim dropped the scissors. [Defendant] grabbed the "closest knife" which "happened to be the butcher knife" that was approximately eight inches long. The women were fighting face to face, holding each other by the hair. [Defendant] tried to stab the victim in a "spot to where [she] felt would not be detrimental to her life," but agreed at trial that stabbing someone with an eight-inch butcher knife could result in death. [Defendant] stabbed the victim with "two very quick jabs" in the right side of the victim's neck, "not with excessive force but just enough to cut her so that she can let me go." The victim let go of [Defendant]. [Defendant] turned around and ran out of the house, taking the knife with her. [Defendant] was cut several times and had a bite mark on the inside of her right arm, opposite her elbow. [Defendant] denied that it came about because she had her arm around the victim's neck. When she left the victim's apartment, [Defendant] went straight home and threw the knife in the bushes.

Darian Howery, a sanitation engineer with Waste Management, was picking up trash at the victim's apartment complex that same day. Between 10 a.m. and noon, he saw [Defendant], armed with a butcher knife, run away from an apartment and get into a car. [Defendant] had blood dripping down her neck. Mr. Howery then saw a body lying in the grass. He notified the apartment manager, who called the police.

When [Defendant] arrived at her house, she called the police to get medical care for her wounds and report that she had been assaulted by the victim. She felt that calling the police would be faster than driving herself to the hospital. When Officer Dionnie Smith arrived at [Defendant]'s apartment in response to her report of assault, [Defendant] told him that she was outside a store and was attacked by the victim, who was armed with a knife.

-3-

[Defendant] did not appear to be in any kind of mortal danger, despite having several cuts and scratches on her neck and arms. [Defendant] informed the officer that she got the knife away from the victim, swung at her, then drove home to call the police.

Further investigation by the officer revealed that there was no store at the street address given by [Defendant]. Officer Smith also learned that the victim was found dead outside her apartment. [Defendant] was arrested and taken for medical treatment, but was not notified at that time about the victim's death.

Investigator Lezley Currin met with [Defendant] after her arrest. [Defendant] initially repeated the story she told to Officer Smith, that she was assaulted by the victim with a box cutter or knife outside a grocery store. When Investigator Currin informed [Defendant] that the victim was dead, [Defendant] broke down and stated that she did not mean to kill the victim. [Defendant] insisted that she went to [the victim]'s house to make her mad and that the victim asked her to leave, but [Defendant] forced her way inside the apartment. Once inside the apartment, [Defendant] told police that the women began fighting, with the victim striking the first blow. [Defendant] maintained that they ended up in the kitchen where the victim grabbed a pair of scissors and began stabbing her in the back, head, and arms. [Defendant] stated that the women were fighting face to face when [Defendant] picked up a knife with her right hand and stabbed the victim twice in the right side of the neck.

Officer Charles Cathey processed the crime scene at the victim's apartment. He located blood on the porch steps and noticed that the living room was in disarray, suggesting that a struggle had taken place. There was blood all over the living room furniture, as well as on the floor and ceiling of the kitchen. The butcher block knife holder was on the floor. Although it had spaces for fourteen implements, there were only seven knives and a pair of scissors in the kitchen at the time. The blood trail led from the victim's apartment to another apartment. Blood was also found in [Defendant]'s car on the driver's seat, as well as on the bumper and back light. The blood on the scissors belonged to both [Defendant] and the victim, however the blood on the knife belonged only to the victim.

The victim died as a result of a two-track stab wound in her neck. The wound was a little longer than two inches in length and was about five inches deep. The victim also had cuts on both of her hands, which were consistent

with trying to grab the knife during the attack. The neck wounds severed both the carotid artery and the jugular vein and punctured the victim's right lung. The victim bled to death, but could have remained conscious for a few minutes after she was stabbed.

Lia Bonds, 2007 WL 3254711, at *1-3 (footnotes omitted).

## II. Sentencing Hearing

On remand, the parties relied on the evidence presented at Defendant's first sentencing hearing and offered no new evidence. At the first sentencing hearing, Erin Webster, the victim's sister, described the effect of the victim's death on the family. Ms. Webster stated that she believed that Defendant felt no remorse for her actions. She said that Defendant never apologized to the family and described Defendant as "heartless." On cross-examination, Ms. Webster acknowledged that she knew about the conflict between the victim and Defendant, and that both women, as well as Mr. Allen, could have stopped the escalation of the hostility between the victim and Defendant.

Defendant testified on her own behalf. Defendant said that she was twenty-seven years old at the time of the sentencing hearing. Defendant graduated from high school and obtained a data entry certificate from Lemoyne-Owen College. Defendant stated that since her incarceration, she had participated in numerous personal development courses offered through the Shelby County Jail. Defendant said that she had never been arrested prior to the current offense and had no prior criminal history.

Defendant acknowledged that she was responsible for the victim's death and stated that she was "very sorrowful and remorseful" for the offense. Defendant said that she had "time and time again wanted to apologize to the family, but [she] did n[o]t want that to play and affect" the case. Defendant stated that she understood that the victim's life was over and said that she "never intended on anything [like] this to happen." Defendant stated:

and right now, because of the opportunity that is presented, I would like to apologize to the family, even though I know that an apology in itself would not bring your sister back, but I am very much so sorrowful. I am very much so remorseful for the things that have happened. I am very much so remorseful for the things that my children as well will have to be affected by this. I am very much so remorseful for the feelings that my family has to go through. I don't know honestly the grief that could, you know, have taken in your family, but I can only imagine. And I hope that the resolving of this case would be a stepping stone to closure that we all need.

According to the presentence report, Defendant was employed by the Memphis City Schools as a line server from January 2001 until May 28, 2004, when she resigned. She also reported working for approximately three months for Payless Shoe Source in 2004. Defendant has two young sons who currently reside with Defendant's mother and aunt. Defendant stated in the report that she began consuming alcohol and using powder cocaine and marijuana in 1995. Defendant reported using cocaine and marijuana every day, but she said that she stopped using alcohol and cocaine in 2003 when she became pregnant. She stopped using marijuana in 2004 when she was incarcerated on the current offense.

Defendant provided the following written statement during the preparation of the presentence report:

> I am guilty of a lot of things, 1) being a woman who allowed the emotional aspect of a relationship to block my better judgment in choices that were truly avoidable. 2) Placing myself and someone else in harm's way especially to the extent that I was in jeopardy of my life [and] the other's life was unintentionally taken. I am deeply sorrowful for my actions [and] if there was anything that could do to take this back, I would even at the time – sacrificing my own life. This is something undoubtedly that I will live with for the rest of my life, [and] my emotional stability is most important, in jail or out of jail. Upon my release, I will still need counseling, jail is neither healthy [n]or therap[e]utic for me at all [and] there are still today emotional instabilities that I unfortunately have endured. I need counseling [and] most importantly closure to beg[i]n the healing process of this event!

On cross-examination, Defendant acknowledged that she went to the victim's apartment that day to make her angry, but she denied that she knew her actions would lead to a fight. Defendant said, however, that she "never despised [the victim] to the extent where [she] wanted to physically hurt her." Defendant acknowledged that the result of a DNA analysis to establish the paternity of one of her children was outstanding at the time of the offense, and Defendant believed it was possible that Mr. Allen was the father of the child. Defendant stated that she did not know when the results would be released, and it was just a "coincidence" that Mr. Allen was informed of the DNA results on the day the victim died. Defendant denied that she was upset that Mr. Allen was living with the victim while dating Defendant, but she then acknowledged that the hostility between the two women "stemmed from the relationship with Mr. Allen." Defendant said that she would have stayed with the victim if she had known the victim was mortally wounded. Defendant said that she had been stabbed nine times, and Defendant did not think the victim's wound was "that extensive" because she was only "stabbed one time." Defendant acknowledged that there was a

difference between being stabbed with scissors and being stabbed with a butcher knife, but she insisted that she "did not use extensive force on [the victim]."

At the first sentencing hearing, the trial court found as an enhancement factor that Defendant "used a deadly weapon during the commission of the offense." T.C.A. § 40-35-114(9). As mitigating factors, the trial court found that Defendant assisted the investigating officers with the location of property involved in the offense, but assigned little weight to this factor. Id. § 40-35-113(10). The trial court found that "Defendant committed the offense under such unusual circumstances that it is unlikely that a sustained intent to violate the law motivated [her] criminal conduct." Id. § 40-35-113(11). The trial court stated, however, "Under that one, I'm giving a little bit of weight to that in the sense that I don't think she really thought there was going to be a death involved in this particular situation." The trial court gave "a great deal of weight" to Defendant's lack of a prior criminal history and "some weight" to Defendant's participation in the classes offered at the jail. Id. § 40-35-113(13). The trial court found:

> [w]hat I'm impressed about from the facts of this particular case is that – and I guess I can find this as a preponderance of evidence – that your client went over to this lady's house, forced herself in. Could have been convicted of felony murder as far as I'm concerned, murder in the perpetration of a burglary. By breaking into her home basically, she escalated this risk, and all [the victim] did, it seemed to me was defend herself in her own home, and [the victim] got the worst of it, because she didn't have as big a weapon as the defendant had.

The trial court also found that Defendant's statements of remorse were not credible. The trial court found that Defendant appeared to be saying what she believed the court wanted to hear. The trial court said, "I don't find that she's particularly remorseful about what happened, other than the particular circumstances that she finds herself in as a result of this." The trial court added:

> [b]ut be that as it may, weighing the one enhancement factor against the various items of mitigation that I previously discussed, I still think that under the circumstances of this particular case that an appropriate punishment, considering everything, including the sentencing principles that we talked about, would be twenty years incarceration.

On remand, the trial court relied on the evidence presented at Defendant's first sentencing hearing and its previous findings, and again sentenced Defendant to twenty years as a Range I, standard offender.

## III. Standard of Review

Effective June 7, 2005, our legislature amended several provisions of the 1989 Sentencing Act in response to the United States Supreme Court case of Blakely v. Washington, 542 U.S. 296, 124 S. Ct. 2531 (2004). See e.g., T.C.A. § 40-35-210, Sentencing Comm'n Cmts. The amendments provided, among other things, that they be applied to defendants who committed a criminal offense on or after June 7, 2005. See id. The amendments further provided that a defendant who was sentenced after June 7, 2005, for offenses committed on or after July 1, 1982, may elect to be sentenced under the amended provisions of the Act by executing a waiver of ex post facto protections. See id. Defendant committed the offense in October 2004 but was sentenced after the effective date of the 2005 amendments. After remand, Defendant executed a written waiver of her ex post facto protections and thus elected to be sentenced under the 1989 Sentencing Act as amended in 2005. Accordingly, unless otherwise noted, the statutes cited in this opinion are those that were in effect at the time that Defendant was sentenced.

On appeal, the party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is improper. See T.C.A. § 40-35-401, Sentencing Comm'n Comments; see also State v. Arnett, 49 S.W.3d 250, 257 (Tenn. 2001). When a defendant challenges the length, range, or manner of service of a sentence, it is the duty of this Court to conduct a de novo review on the record with a presumption that the determinations made by the court from which the appeal is taken are correct. T.C.A. § 40-35-401(d). This presumption of correction, however, "'is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances.'" State v. Carter, 254 S.W.3d 335, 344-45 (Tenn. 2008) (quoting State v. Ashby, 823 S.W.2d 166 (Tenn. 1991)). "If, however, the trial court applies inappropriate mitigating and/or enhancement factors or otherwise fails to follow the Sentencing Act, the presumption of correctness fails," and our review is de novo. Carter, 254 S.W.3d at 345 (quoting State v. Shelton, 854 S.W.2d 116, 123 (Tenn. Crim. App. 1992); State v. Pierce, 138 S.W.3d 820, 827 (Tenn. 2004)).

A trial court is mandated by the Sentencing Act to "impose a sentence within the range of punishment." T.C.A. § 40-35-210(c). A trial court, however, "is no longer required to begin with a presumptive sentence subject to increase and decrease on the basis of enhancement and mitigating factors." Carter, 254 S.W.3d at 346. Therefore, an appellate court is "bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." Id.

In conducting a de novo review of a sentence, this Court, like the trial court, must consider (a) the evidence adduced at the trial and the sentencing hearing; (b) the presentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) evidence and information offered by the parties on the enhancement and mitigating factors set forth in Tennessee Code Annotated sections 40-35-113 and 40-35-114; (f) any statistical information provided by the Administrative Office of the Courts as to Tennessee sentencing practices for similar offenses; and (g) any statement the defendant wishes to make in the defendant's own behalf about sentencing. T.C.A. § 40-35-210(b); see also Carter, 254 S.W.3d at 343; State v. Imfeld, 70 S.W.3d 698, 704 (Tenn. 2002).

## IV. Analysis

Defendant was convicted of second degree murder, a Class A felony. As a Range I, standard offender, Defendant was subject to a sentence of between fifteen and twenty five years. T.C.A. § 40-35-112(a)(1). Defendant acknowledges that under the 2005 amendments to the Sentencing Act, the weighing of the various mitigating and enhancement factors is left to the trial court's sound discretion. See Tenn. Pub. Acts ch. 353 §§ 8, 9. Defendant argues, however, that a sentence of twenty years, based on the presence of four mitigating factors and one enhancement factor, is excessive and contrary to the purpose and principles of the Sentencing Act. Defendant submits that based on her lack of criminal history, her attempts to rehabilitate herself in jail, and the other mitigating factors found by the trial court, she should be sentenced to a mitigated sentence of thirteen and one-half years or, at the most, fifteen years.

Defendant cites State v. Gutierrez, 5 S.W.3d 641 (Tenn. 1999) as support for her contention that her sentence should be reduced. In Gutierrez, the defendant was convicted of voluntary manslaughter following the shooting death of his live-in girlfriend during an argument. Id. at 643. Defendant was sentenced as a Range I, standard offender, under the 1989 Sentencing Act, to six years, or the maximum in the sentencing range for a Class C felony based on the presence of two enhancement factors and one mitigating factors. Id. at 644.

Upon review, the supreme court found that the record was insufficient to support one of the enhancement factors. Id. at 646. Based on the one remaining enhancement factor "and the mitigating factors that the defendant did not have a criminal history and was well regarded in his community," the supreme court modified the defendant's sentence to four years. Id. at 647.

A reviewing court still retains the authority under the 2005 amendments to "affirm, reduce, vacate or set aside the sentence imposed" in case of error. T.C.A. § 40-35-401(c). However, the 2005 amendments to the Sentencing Act introduced significant changes to the sentencing process which were not present when Gutierrez was decided. As our supreme court explained:

> [p]rior to 2005, the Sentencing Act set forth a "presumptive sentence" to be imposed within the applicable range: the minimum sentence for all felonies other than Class A felonies, and the midpoint sentence for Class A felonies. T.C.A. § 40-35-210(c) (2003). Thus, in imposing a specific sentence within a given range, the trial court began with the presumptive sentence. See id.; State v. Gomez, 239 S.W.3d 733, 739 (Tenn. 2007) ("A sentencing court could not increase a defendant's sentence above the presumptive sentence except upon the application of statutory enhancement factors."). If the trial court determined that statutory enhancement factors applied, see [T.C.A.] § 40-35-114 (2003), the trial court had the authority to increase the presumptive sentence up to the maximum within the range, see id. § 40-35-210(d). If the trial court determined that statutory mitigating factors also applied, see id. § 40-35-113, the trial court could reduce the enhanced sentence, see id. § 40-35-210(e) ("Should there be enhancement and mitigating factors for a Class B, C, D or E felony, the court must start at the minimum sentence in the range, enhance the sentence within the range as appropriate for the enhancement factors, then reduce the sentence within the range as appropriate for the mitigating factors."). The weight the trial court accorded any applicable enhancement and mitigating factors was left to the trial court's discretion. Id., Sentencing Comm'n Cmts.; Gomez, 239 S.W.3d at 739-40.

Carter, 254 S.W.3d at 342.

Under the 2005 amendments, however, a presumptive sentence is no longer statutorily imposed for each class of felony. "Rather, the trial court is free to select any sentence within the applicable range so long as the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" Id., at 343 (quoting T.C.A. § 40-35-210(d)). A trial court "shall consider, but is not bound by" the "advisory sentencing guidelines," including the consideration of statutory enhancement and mitigating factors. T.C.A. § 40-35-210(c). "Thus, the 2005 revision to section -210 increases the amount of discretion a trial court exercises when imposing a sentencing term." Id., at 344. Moreover, "[s]ignificantly, the 2005 amendments deleted as grounds for appeal a claim that the trial court did not weigh properly the enhancement and mitigating factors." Id.; see 2005 Tenn. Pub. Acts ch. 353, §§ 8, 9.

Based on the foregoing, we find the situation presented in Carter more instructive to the present case than Gutierrez. In Carter, as relevant here, the defendant was convicted of vehicular homicide. The State presented evidence that the defendant had prior criminal convictions beyond those necessary to establish his status as a Range III persistent offender, that he had previously failed to comply with the conditions of a sentence involving release into the community, and that the defendant was on parole for a Kentucky felony conviction and on probation for a Tennessee felony conviction at the time the offense was committed. Id. 340, 345. The defendant introduced requests for leniency from his family and the victim's family, "and emphasized the conduct of the Kentucky officers in pursuing" him. Id. at 345. Based on this mitigating information, the trial court sentenced the defendant as a Range III, persistent offender, to the minimum sentence in the sentencing range, or ten years, despite the presence of enhancement factors. Id. at 337. The State appealed the trial court's sentencing determinations.

Upon review, the supreme court concluded:

Although Tennessee's appellate courts retain the statutory authority to increase sentences upon appeal by the State, [T.C.A.] § 40-35-402(c) (2006), we hold that they do not have the authority to do so simply upon the basis of a trial court's "fail[ure] to appropriately adjust" a sentence in light of applicable, but merely advisory, mitigating or enhancement factors. As set forth above, revised section 40-35-210(c) of the Sentencing Act mandates that the trial court "shall impose a sentence within the range of punishment." In determining which sentence within the range to impose, however, the trial court is no longer required to begin with a presumptive sentence subject to increase and decrease on the basis of enhancement and mitigating factors. An appellate court is therefore bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act.

Id. at 346. Despite an acknowledgment that it was uncomfortable with the imposition of a minimum sentence based on the circumstances of the offense, the supreme court nonetheless found that the trial court considered the criteria set forth in section -210(b), the sentence was imposed within the applicable sentencing range, the trial court set forth its reasons for imposing the sentence, and its findings were adequately supported by the record. Id. "Because insufficient grounds exist[ed] on the record before [the court] to overcome the presumption" of correctness, the supreme court affirmed the judgment of the trial court. Id.

-11-

Turning to the case <u>sub judice</u>, the trial court found the presence of one enhancement factor, Defendant's use of a deadly weapon during the commission of the offense, and accorded this factor significant weight. The trial court acknowledged the presence of several mitigating factors but assigned little weight to these considerations, except for Defendant's lack of a criminal history, as was within its discretion. The <u>Carter</u> court noted that "if the trial court recognizes and enunciates several applicable mitigating factors, it does not abuse its discretion if it does not reduce the sentence from the maximum on the basis of those factors." <u>Id.</u> at 345. The supreme court reiterated that "[t]he appellate courts are therefore left with a narrower set of circumstances in which they might find that a trial court has abused its discretion in setting the length of a defendant's sentence." <u>Id.</u> 345-46.

The record shows that the trial court considered all of the factors set forth in Tennessee Code Annotated section 40-35-210(b) and explained the reasons for imposing the sentence. These findings are adequately supported by the record, and Defendant's sentence falls within the sentencing range for a Range I, standard offender, convicted of a Class A felony. Based on our review, we conclude that the trial court complied with the principles and purpose of the Sentencing Act and did not abuse its discretion in sentencing Defendant to twenty years. Defendant is not entitled to relief on this issue.

## CONCLUSION

After a thorough review, we affirm the judgment of the trial court.

_____
THOMAS T. WOODALL, JUDGE